STATE OF VERMONT

ENVIRONMENTAL COURT

In re: State of Vermont, }
    Department of Fish and Wildlife }      Docket No. 128-6-05 Vtec
    (garage/storage building for use of Cameron) }
    (Appeal of Dawson and Sullivan) }

Decision and Order

Appellants Margaret J. Dawson and Martha J. Sullivan appealed from a decision of the Development Review Board (DRB) of the Town of Salisbury which issued a variance from the front and side setback requirements of the zoning ordinance for the construction of a 24' x 30' garage/storage building at the State of Vermont Salisbury Fish Culture Station.[1] Appellants appeared and represented themselves; Appellee-Applicant State of Vermont (the State) is represented by Stephen K. Hill, Esq. (Special Assistant Attorney General); the Town of Salisbury entered an appearance through Donald R. Powers, Esq., but did not participate at trial. An evidentiary hearing was held in this matter before Merideth Wright, Environmental Judge, who issued findings and a ruling orally on the record, to be followed by this written decision and judgment order.

The Salisbury Fish Culture Station is a state facility located in a Low Density Residential zoning district. The facility raises brook trout, brown trout, rainbow trout, steelhead and lake trout; its mission is to raise these fish to an age old enough to provide broodstock capable of producing eggs that are then shipped to the other fish culture stations around the state. Just-hatched fish or "fry" are valued at only pennies per fish, yearling fish are valued at $2 to $3 per fish, while brood fish, as they are raised to an older

---

[1] Facilities such as this were formerly called fish hatcheries, but as the state in fact rears the fish for a period of time after hatching, the term 'fish culture station' is now used.

1

age and are bigger, and are certified as being disease free, are more valuable. They are also more valuable because they have been genetically selected to provide the state with several genetic lines, to maintain genetic diversity in the state's fish population.

The quality and quantity of the water circulating through the fish culture station is most important to the success of these breeding populations. The water must be monitored 24 hours per day, seven days a week, as the fish obtain their oxygen supply from the flowing water. It only takes fifteen to twenty minutes after water stops flowing for all the fish to die. Loss of the broodstock would affect the state's fish population for two to six years before replacement genetic brood lines could be redeveloped for all the stocked species. Some 180 million fish statewide would be affected annually, including thirty to forty million salmonid fish supplied to Lake Champlain. Unlike some of the other fish culture stations in the state which are supplied by gravity flow of water unaffected by electrical outages or mechanical pump failures, the Salisbury station is dependent on pumped water, making it necessary for there to be a qualified supervisor or assistant supervisor actually on-site at all times. The assistant supervisor at the Salisbury facility must be on-site for 16 hours a day for 26 weeks in the year, and therefore must live at the facility. The short time frame available for responding to an emergency affecting the pumps makes the position a high-stress position and makes it harder for the State to recruit qualified employees.

In order for the State to recruit and keep a qualified supervisor and assistant supervisor for the Salisbury facility, or indeed for any similar facility with pumped water, the employment contract must include adequate living facilities, as well as appropriate overtime or standby pay for the additional hours, as both the supervisor and assistant supervisor must live on-site. At the Salisbury facility, the supervisor (facility manager) lives in a house at the hatchery building. The Salisbury facility has been listed on the National Register of Historic Places since the early 1990s; however, unlike the hatchery

2

building, the assistant supervisor's residence is not a contributing feature to the historic listing of the facility as a whole.

The pump house, which must be reached quickly on foot in an emergency, is located approximately halfway between the manager's residence and the assistant supervisor's residence. At the Salisbury facility, the assistant supervisor's residence is a small modular home built in approximately 2002[2] on a slab, on the original pad of the previously-existing trailer for the assistant supervisor, placed at that location at some time more than twenty years previously.[3] The assistant supervisor's residence has no basement or attic and no garage or other sizeable outbuilding is associated with it, and accordingly no adequate storage space. It is inadequate for an employee with a family, such as the present assistant supervisor, Mr. Cameron. Previous assistant supervisors at the site had been single, so that the issue of the adequacy of the residence for a family did not arise in the past. The proposed garage/storage building is necessary to provide sufficient room at the assistant supervisor's residence to allow a family to live there, due primarily to the provision of storage in the proposed building rather than to the provision of shelter for a vehicle.

Unlike the zoning ordinances for some other municipalities, the Salisbury Zoning Regulations do not provide for reduced side and front setbacks for accessory buildings such as the proposed garage/storage building. One well serving the modular home is on

---

[2] We note that nothing about the placement of the modular home where it is located is before the Court in the present proceeding. That home and its septic tank and leach field were installed no later than about 2002; the zoning permit to install the modular home was not appealed or otherwise challenged at that time. Under 24 V.S.A. §4472(d), the placement of the modular home cannot now be challenged, either directly or indirectly, even if its placement is what drives the location of the proposed garage/storage building at issue in the present appeal.

[3] It is possible that the former assistant supervisor housing was placed at the site before the adoption of zoning in Salisbury; however, no evidence was presented as to when the first zoning regulations were adopted or what they provided as to setbacks in this location.

one end of the concrete slab, the septic tank and leach field are on the other end of the concrete slab, and the second well, together with two springs and a ditch, indicating wet ground, are located behind the concrete slab. Other than the proposed location, there is insufficient room between the residence and the road or the very large trees to locate the proposed building and provide for sufficient room to maneuver vehicles. A storage building much farther from the house elsewhere on the facility's property would be impractical for the family's daily or short-term storage use. The proposed building is as small as practical to provide both the storage and the garage function needed to make the small modular home practical for the use of a family.

Ordinarily, in order to qualify for a variance, Appellant must meet all five requirements of §341 of the Zoning Regulations (underlining in original):

> (A) That there are <u>unique physical circumstances</u> or conditions, including irregularity, narrowness, or shallowness of lot size or shape, or exceptional topographical or other physical conditions peculiar to the particular property, and that unnecessary hardship is due to such conditions, and not the circumstances or conditions generally created by the provisions of the zoning regulation in the neighborhood or district in which the property is located;
> (B) That because of such physical circumstances or conditions, there is no possibility that the property can be developed in strict conformity with the provisions of the zoning regulation and that the authorization of a variance is therefore necessary to enable the <u>reasonable use of the property</u>;
> (C) That the unnecessary <u>hardship has not been created by the appellant</u>;
> (D) That the variance, if authorized, <u>will not alter the essential character of the neighborhood or district in which the property is located</u>, substantially or permanently impair the appropriate use or development of adjacent property, reduce access to renewable energy resources, nor be detrimental to the public welfare; and
> (E) That the variance, if authorized, will represent the minimum variance that will afford relief and will represent the <u>least deviation possible from the zoning regulation</u> and from the plan.

Section 341 also requires that variances only be granted by the Zoning Board (now the DRB) "only in strict accordance with the provisions of 24 V.S.A. §4469," the state variance

4

statute. See <u>In re Appeal of Mutchler, et al.,</u> 2006 VT 43.

In the present case, the DRB found that the proposal met all five of these requirements. While the evidence at trial may not have established that the proposal meets the requirements of subsections B or E <u>without</u> regard to the State's need for adequate housing for the assistant supervisor, as it is the State that is the applicant for the permit, we must instead analyze the proposal under 24 V.S.A. §4413(a).

This section allows municipalities to regulate state facilities such as the Salisbury Fish Culture Station regarding criteria such as setbacks, but only to the extent that the regulation does not interfere with the intended functional use of the state facility. We found at trial and reiterate here that denial of approval of the proposed garage/storage building would interfere with the intended functional use and operation of the Salisbury Fish Culture Station, because it would interfere with the State's ability to recruit and keep a qualified assistant supervisor who is required to live at the facility to perform the critical emergency functions at the facility at least 16 hours a day on at least half the days in the calendar year.

Based on the foregoing, it is hereby ORDERED and ADJUDGED that approval of construction of the garage/storage building as proposed within the front and side setbacks is granted, with the conditions imposed by the DRB in its decision, on the basis that denial of its approval would interfere with the intended functional use of the state Salisbury Fish Culture Station facility under 24 V.S.A. §4413(a).

Dated at Berlin, Vermont, this 20th day of September, 2006.

_____
Merideth Wright
Environmental Judge

5